# MATTER OF T-

## In Exclusion Proceedings

### A-28464467

*Decided by Board October 13, 1992*

(1) The Government of Sri Lanka does not persecute ethnic Sri Lankan Tamils on the basis of their ethnicity or "on account of" their championing of Tamil interests or political rights.

(2) Neither the relief of asylum nor of withholding of deportation provides for refuge "on account of" human rights abuses unconnected to the grounds enumerated in the Immigration and Nationality Act, i.e., race, religion, nationality, membership in a particular social group, or political opinion.

(3) An ethnic Tamil alien from Sri Lanka who was forced to assist the Liberation Tigers of Tamil Eelam ("LTTE"), a separatist Tamil terrorist group, under threat of harm, did not establish that the LTTE was motivated to punish him because of his political views or persecute him on account of any of the other grounds enumerated in the Act.

(4) In light of the historical context of the Sri Lankan civil war, an ethnic Tamil alien suspected of having ties to the terrorist group LTTE failed to demonstrate that the human rights abuses he suffered at the hands of the Sri Lankan security forces, Indian Peacekeeping Force, and allied Tamil organizations in reaction to LTTE terrorism amounted to persecution on account of any of the grounds enumerated in the Act.

EXCLUDABLE: Act of 1952—Sec. 212(a)(6)(C)(i) [8 U.S.C. § 1182(a)(6)(C)(i)]—
Fraud or willful misrepresentation of a material fact

Sec. 212(a)(7)(A)(i)(I) [8 U.S.C. § 1182(a)(7)(A)(i)(I)]—
No valid immigrant visa

ON BEHALF OF APPLICANT:
Daniel H. Smith, Esquire
MacDonald, Hoague & Bayless
1500 Hoge Building
705 Second Avenue
Seattle, Washington 98104-1745

ON BEHALF OF SERVICE:
Thomas P. Molloy
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated March 6, 1992, the immigration judge found the applicant excludable on the grounds set forth above, based upon his admissions. Furthermore, the immigration judge denied his applications for asylum under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a) (1988), and for withholding of

exclusion and deportation under section 243(h)(1) of the Act, 8 U.S.C. § 1253(h)(1) (Supp. II 1990), and ordered him excluded and deported from the United States. The applicant, through counsel, has appealed from that decision with respect to the denial of relief from exclusion and deportation. The appeal will be dismissed. The applicant's request for oral argument before for the Board is denied. *See* 8 C.F.R. § 3.1(e) (1992).

The record reflects that the applicant is a 37-year-old native and citizen of Sri Lanka, who is a member of the Tamil ethnic group. He claimed persecution by the Government of Sri Lanka and by various groups allied with the Government because of his association with the Liberation Tigers of Tamil Eelam ("LTTE"), a separatist Tamil terrorist organization. The applicant also claimed persecution by the LTTE.

Specifically, the applicant explained that he operated a grocery store in the Jaffna area of northern Sri Lanka. He indicated that in 1986, members of the LTTE began to visit his business and demand food and cigarettes. He related that because they were armed, he complied with their demands. He observed that while he agreed with the pro-Tamil goals of the LTTE, he opposed their use of violence.

The applicant recounted that in August 1987, after the Indian Peacekeeping Force ("IPKF") had occupied the area, he was arrested and brought to one of its camps. He declared that despite his plea of compulsion, he was accused of assisting the LTTE. He advised that, as a result, he was severely beaten by elements of the Eelam People's Revolutionary Liberation Front ("EPRLF"), a Tamil organization opposed to the LTTE, which had allied itself with the IPKF. He noted that he suffered a broken nose and lacerations to his body.

According to the applicant, when his wife came to beg for his release after 3 days, the IPKF refused to free him and instead kept him confined for 2 weeks, during which time he received medical treatment. He stated that when he finally returned to his store, he found that it had been ransacked.

The applicant recounted that after the withdrawal of the IPKF, the LTTE reasserted its power in the Jaffna area. He advised that in March 1990, the LTTE insisted that he become a process server for a mediation office which it had created. He explained that he was chosen for this job because, as a store owner, he was familiar with the people in his neighborhood.

The applicant related that in late October 1991, while returning to his home from a business trip, he encountered people fleeing the area. He indicated that he was informed that the Sri Lankan military had occupied the sector and that he should not return because of his work for the LTTE. He stated that, as a result, he went to stay with relatives

in Jaffna. According to the applicant, he decided to leave Jaffna after 10 days because of the continued advance of the Sri Lankan military.

The applicant testified that he traveled to Colombo, in southern Sri Lanka, where he found shelter with a relative. He stated that the members of the household were required to register his presence with the local authorities, and that they did so on November 15, 1991. He explained that he was afraid to remain in Colombo because the EPRLF, as well as the Eelam National Democratic Liberation Front ("ENDLF"), were searching out LTTE supporters in conjunction with the Sri Lankan security forces. He related that he therefore obtained money from his brother in Canada and arranged to be smuggled out of the country on December 4, 1991. After his departure from Sri Lanka, the applicant learned from his brother, who had contacts in Colombo, that the police had come to search for him.

Turning to an analysis of the applicant's persecution claim, we point out that we have assumed, arguendo, that the factual basis of his story is worthy of belief. However, given the complexity of the political situation in Sri Lanka, we have carefully reviewed the applicant's claims of persecution in light of the background materials contained in the record. According to those documents, the applicant's claim is set against the backdrop of a terrorist campaign conducted by the LTTE. This group, which represents only a small portion of the ethnic Sri Lankan Tamil population, is centered in certain portions of northern and eastern Sri Lanka. Other major ethnic Sri Lankan Tamil groups and political figures have been engaged in political discussions with the Government of Sri Lanka and have agreed to a 19-point political program aimed at accommodating the various interests of the Tamil, Sinhalese, and Moslem populations of the country. This program was arranged through the mediation of the Government of India, which has taken an interest in the situation because of internal political pressures related to the Indian State of Tamil Nadu.

It is thus crucial to an assessment of the applicant's claim to understand that the Government of Sri Lanka has been engaged in discussions and negotiations with ethnic Sri Lanka political leaders concerning Tamil demands. It is against this context that the applicant's claim of persecution "on account of" his Tamil ethnicity and political views has to be weighed.

It is also necessary to consider the historical context of the applicant's claims. The applicant portrays himself as a member of a "minority," but this label does not accurately convey the historical role of ethnic Sri Lankan Tamils in Sri Lanka. During the British colonial period, Sri Lankan Tamils were used by the British to rule Sri Lanka. Following independence, Tamils participated fully in the political life of the country, where universal suffrage was the standard

and minority rights were protected by the constitution. For decades after independence, various Tamil political parties played an important role in coalition governments. This participation occurred even though there were strong Sinhalese nationalist groups who agitated for special consideration for the Sinhalese majority, to make up for the economic and educational disadvantages they had suffered under colonial rule. For years, in fact, in the 1950s and 1960s, the Government of Sri Lanka was preoccupied with the threat from leftist Sinhalese groups who launched a violent underground struggle to overthrow the government. Eventually, the Government was able to suppress the violent Sinhalese groups, most prominently the Janatha Vimukthi Peramuna ("JVP"), which had asserted a form of Sinhalese nationalism.

In the early 1970's, some radical Sri Lankan Tamils began to agitate for autonomy or actual separation from Sri Lanka. Indeed, a number of Tamil parties, including the Tamil United Liberation Front ("TULF"), successfully ran candidates for parliament on separatist platforms. The political negotiations, however, did not suit the most radical of the Tamil separatists, who began to arm themselves with the assistance of Tamils in the Indian State of Tamil Nadu. These radicals began a concerted terrorist campaign in which policemen, soldiers, political figures, and others, both Sinhalese and Tamil, were murdered. Terrorist bombings were a favorite tactic. In 1983, partly in response to the ambush killings of government soldiers by the LTTE, and partly because of the heated atmosphere generated by national elections, Sinhalese in the city of Colombo rioted and attacked Tamils. The Government was able to suppress the disturbances after about a week.

After that, the situation in northern Sri Lanka continued to deteriorate as the radical Tamil groups escalated the level of violence. There was also a concerted effort by the LTTE to destroy rival Tamil groups, and attacks were carried at great loss of life against the Tamil Eelam Liberation Organization ("TELO"), and the EPRLF in 1986. These groups had shown a desire to negotiate a peaceful resolution to the conflict. The LTTE objective, in addition to destroying rival Tamil groups, was to drive out all the institutions of the state, and, of course, police and military forces were a major target. The LTTE forces systematically engaged in horrible atrocities in order to establish a reign of terror. Initially, this campaign was aimed at government personnel, but quickly came to include innocent persons murdered and driven from their homes solely because of their Sinhalese ethnicity. According to the Amnesty International reports in the record, among the more atrocious acts of the LTTE were the bombings of bus stations and buses and armed attacks on buses, in which hundreds of people were butchered. The terrorism also was directed at ethnic Tamils who

did not support the radical groups and more recently has been aimed at Moslems, in order to create ethnically pure Tamil districts.

In 1987, the Government of India forced the Government of Sri Lanka to accept the assistance of the IPKF in order to monitor the 19-point political program which the Government of India had brokered. This force was sent into northern Sri Lanka to begin the supervised disarming of the various Tamil groups. The LTTE was the only major Tamil guerrilla group to refuse to participate, and it launched assaults on the IPKF, which responded with powerful military attacks against the LTTE. This struggle culminated in the seizure of Jaffna, the major LTTE stronghold.

In 1990, the IPKF withdrew from Sri Lanka, but the LTTE continued its attacks. The Government of Sri Lanka employed its security forces to counter the LTTE and in this undertaking had the assistance of several major ethnic Sri Lankan Tamil groups, among them TELO, the EPDP, and the EPRLF.

Viewed in light of these facts, the applicant's assertions regarding his claim of persecution "on account of" his ethnicity and his political views are remarkably simplistic and misleading. First, the Government of Sri Lanka works with major Tamil organizations who seek a peaceful resolution of the situation. Second, major Tamil organizations provide military assistance to the Government in its efforts to combat the only major terrorist group which has refused to renounce violence.

We are satisfied from the record that the Government of Sri Lanka does not persecute ethnic Sri Lankan Tamils on the basis of their ethnicity. This claim is in fact contradicted by the political and military cooperation shared by the Government and major Tamil groups, and the history of participation by Tamils in the Government of Sri Lanka.

Second, it is clear that the Government of Sri Lanka does not persecute Tamils "on account of" their championing of Tamil interests or political rights. In fact, it appears the Government has tried in the most difficult of circumstances to reach a mutually agreeable accommodation by peaceful negotiations. The Government even went so far as to allow the Government of India (historically sympathetic and helpful to Tamil groups) to use its political and military might in Sri Lankan territory. But even the Indians found themselves viciously attacked by the LTTE. The record establishes that the violence in Sri Lanka was begun by terrorist Tamil forces and continues because of terrorist Tamil forces. It is not the Government of Sri Lanka that attacked Tamils, and it is not the Government Sri Lanka that wishes the violence to continue.

It is clear that in the course of this violent decade in Sri Lanka,

innocent Tamils have been killed by security forces, and human rights abuses have occurred. The LTTE has set out to create an atmosphere of violence and terror and in so doing has consciously tried to incite Sri Lankan and rival Tamil groups to retaliate. This is a common tactic of guerrilla organizations. Thus, Amnesty International, in its report, "Sri Lanka-The Northeast," states that the LTTE captured and executed hundreds of Sri Lankan officers and "disappeared" others. Amnesty International, *Sri Lanka-The Northeast,* AI Index: ASA 37/14/91, at 7 (Sept. 1991). The LTTE also killed hundreds of Sinhalese, Moslems, and Tamils. All of the LTTE's opponents in turn retaliated with attacks of their own.

It also appears indisputable that human rights abuses occur on a large scale. This does not mean, however, that these abuses, standing alone, translate into persecution as defined in the Act. The applicant here, for instance, complains of mistreatment at the hands of the Tamil group, EPRLF, which is aligned with the Government against the LTTE. But the EPRLF is a Tamil organization, and it also supports Tamil claims, so it could not be persecuting the applicant on account of his shared Tamil ethnicity or political views.

The same logical failure results with his assertions regarding the IPKF. That force went to Sri Lanka to enforce a political program favorable to Tamil demands and was sent by a government sympathetic to Tamil claims. The applicant has failed to show that the IPKF was transformed into an anti-Tamil force once it was in Sri Lanka. The applicant's claims vis-a-vis the other Tamil group, the ENDLF, also fail. This group was both aligned with the Government and supported the Tamil claims supposedly supported by the LTTE and the applicant.

As to the government forces, at least the ethnic Sinhalese members, it appears that they have engaged in human rights abuses. But the Amnesty International report shows that these abuses have also been directed against ethnic Sinhalese groups, in particular the JVP. Our reading of the Amnesty International report indicates that the Government of Sri Lanka has said it "would deal with the LTTE in the same manner as it had recently dealt with the JVP in the south." Amnesty International, *supra,* at 7. This reference to the JVP relates to the government suppression of the attempt in recent years by that ethnic Sinhalese group to overthrow the government, as the JVP had tried to do several decades ago. As the Amnesty International report also makes clear, the Government has pledged to stop these human rights abuses and has accepted recommendations made by Amnesty International on this subject. At the same time Amnesty International has recognized that these human rights abuses (which their report nowhere terms "persecution") have "taken place in the context of

armed conflict between government security forces and the LTTE. Amnesty International appreciates the particularly difficult law and order situation this has created." *Id.* at 1.

This Board in turn appreciates the awful circumstances in which the Sri Lankan Government and large numbers of the inhabitants of that country find themselves. But if we were to accept the applicant's assessment of human rights violations as constituting persecution under the Act, Tamils, Moslems, and Sinhalese alike would all be persecuted in Sri Lanka. Neither the relief of asylum nor of withholding of deportation provides for refuge "on account of" human rights abuses unconnected to the grounds enumerated in the Act, i.e., race, religion, nationality, membership in a particular social group, or political opinion. *See* sections 208(a), 243(h)(1) of the Act; section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1988).

We have carefully reviewed the entire record on a de novo basis.[1] We conclude that the applicant has failed to establish past persecution or a well-founded fear of future persecution in Sri Lanka on account of any of the grounds enumerated above. *See* sections 101(a)(42)(A), 208(a) of the Act; 8 C.F.R. § 208.13 (1992); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (holding that the asylum standard is more generous than the withholding standard); 8 C.F.R. § 208.13(b)(2) (1992) ("reasonable possibility" definition of well-founded fear asylum standard).

Moreover, contrary to the assertions of the applicant regarding his asylum claim, we find that the reasoning set forth by the United States Supreme Court in *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), is controlling in this matter. With respect to the LTTE, we are not persuaded that the forced donation of goods and services was premised upon any of the enumerated grounds. For instance, despite the general political agenda of the LTTE, it appears that this organization sought out the applicant simply to help satisfy its need for supplies and manpower. *See id.* at 816. There is no convincing evidence that the militants were motivated to punish him because of his political views, inter alia. Indeed, there would be no reason to do so. He testified that he *agrees* with the group's goals.

This rationale also applies to that aspect of the applicant's claim dealing with the IPKF, the EPRLF, the ENDLF, and the Sri Lankan security forces. Specifically, in order to prove persecution "on account of" one of the enumerated grounds, an alien must do more than show mistreatment by the government or a particular group.

---

[1] Pursuant to regulation, the record also contains an advisory opinion issued by the Department of State's Bureau of Human Rights and Humanitarian Affairs. 8 C.F.R. §§ 208.11(b)-(c) (1992).

Whether voluntarily or involuntarily, the applicant directly associated with the LTTE, a Tamil extremist group which bears primary, if not sole, responsibility for continuing and escalating the violence in Sri Lanka. Unlike moderate Tamil organizations, the LTTE refused to participate in political settlements worked out by the government. Reacting to the brutal tactics of the LTTE, the Sri Lankan security forces, the IPKF, and the allied Tamil groups sought out LTTE cadres in an attempt to end the violence and preserve the government. The applicant was swept up in this effort.

It may well be that the organizations seeking to curb the LTTE were driven to acts of revenge as a result of the militants' terrorism, but this is in the nature of civil war. Harm arising from general civil strife does not amount to persecution within the meaning of the Act. *See, e.g., Martinez-Romero v. INS*, 692 F.2d 595 (9th Cir. 1982).

Inasmuch as the applicant cannot demonstrate statutory eligibility for asylum, it follows that he cannot establish statutory eligibility for withholding. *See generally Rodriguez-Rivera v. INS*, 848 F.2d 998, 1007 (9th Cir. 1988). The evidence does not demonstrate that it is more likely than not that if the applicant were now to return to Sri Lanka, he would be persecuted within the meaning of the Act. *See* section 243(h)(1) of the Act; *INS v. Stevic*, 467 U.S. 407 (1984); 8 C.F.R. § 208.16 (1992).

Accordingly, the appeal will be dismissed.

**ORDER:**     The appeal is dismissed.