# In re S-P-, Applicant

File A72 971 091- San Francisco

*Decided June 18, 1996*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Although an applicant for asylum must demonstrate that harm has been or would be inflicted on account of one of the protected grounds specified in the "refugee" definition, persecution for "imputed" reasons can satisfy that definition.

(2) In mixed motive cases, an asylum applicant is not obliged to show conclusively why persecution has occurred or may occur; however, in proving past persecution, the applicant must produce evidence, either direct or circumstantial, from which it is reasonable to believe that the harm was motivated in part by an actual or imputed protected ground.

(3) In situations involving general civil unrest, the motive for harm should be determined by considering the statements or actions of the perpetrators; abuse or punishment out of proportion to nonpolitical ends; treatment of others similarly situated; conformity to procedures for criminal prosecution or military law; the application of antiterrorism laws to suppress political opinion; and the subjection of political opponents to arbitrary arrest, detention, and abuse.

(4) Asylum was granted where the applicant was detained and abused by the Sri Lankan Government, not only to obtain information about the identity of guerrilla members and the location of their camps, but also because of an assumption that his political views were antithetical to those of the Government.

FOR APPLICANT: Judith L. Wood, Esquire, Los Angeles, California

FOR IMMIGRATION AND NATURALIZATION SERVICE: Andrew R. Arthur, General Attorney

BEFORE: Board En Banc: SCHMIDT, Chairman; HOLMES, HURWITZ, VILLAGELIU, ROSENBERG, MATHON, and GUENDELSBERGER, Board Members. Concurring Opinion: FILPPU, Board Member, joined by DUNNE, Vice Chairman, HEILMAN, and COLE, Board Members. Dissenting Opinion: VACCA, Board Member.

GUENDELSBERGER, Board Member:

In a decision dated April 3, 1995, an Immigration Judge found the applicant to be excludable as alleged and denied his requests for asylum and withholding of deportation pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h)(1994).

The applicant appealed the denial of asylum, arguing in part that the Immigration Judge abused her discretion.

On May 9, 1995, the Immigration and Naturalization Service filed a motion requesting summary dismissal of the appeal on the grounds that the Notice of Appeal lacked the required specificity and that the applicant had failed to file an appellate brief. Meanwhile, on May 5, 1995, the applicant timely filed an appellate brief which more clearly specified the reasons for his appeal. The Service submitted a late brief on December 4, 1995. The Service's motion for summary dismissal is denied. The applicant's appeal is sustained.

## I. FACTUAL BASIS FOR THE ASYLUM CLAIM

The applicant is a 34-year-old Sri Lankan national of Tamil ethnicity. He was a welder by trade and had his own welding shop for several years. In November 1993, the applicant and his wife relocated to a Red Cross refugee camp near Elali in northern Sri Lanka. The Liberation Tigers of Tamil Eelam ("LTTE" or "Tigers") took the applicant from the refugee camp and forced him to work for them as a welder in one of their base camps near Elali. There were about 30 others in this camp who, like the applicant, were forced to work for the Tigers. These workers were taken to various work sites during the day and brought back to the Tigers' camp in the evening. The applicant testified that he was not mistreated by the Tigers, but that he was watched at all times and believed he would be severely punished were he to attempt an escape.

In March 1994, the applicant was in the Tigers' camp when it was raided by the Sri Lankan Army. The applicant hid in a bunker during the attack which lasted about 3 hours. When he emerged, he was surrounded by 50 to 60 Sri Lankan soldiers. The soldiers accused him of being a Tiger and took him and 12 other conscripted workers captured with him to the Sri Lankan Army camp in Elali. At that camp, he and the 12 other workers were kicked and beaten with plastic pipes and gun butts.

Two days after he was captured, the applicant and the 12 other workers were taken by ship to Magazine Army Prison in Colombo. In Colombo, the applicant was asked questions and his answers were written down. He then signed a document written in Sinhala, a language he can speak but cannot read.

The applicant was held by the Army in the Colombo prison for 6 months, from March 25 to September 18, 1994, during which time he was mistreated during at least eight sessions. On one occasion, he was placed in a room with burning chilies which caused choking and smoke inhalation. On other occasions, he was threatened with guns by drunken soldiers, tied up, and beaten. On four occasions the barrel of a gun was held to his head and he was told that

if he did not tell the truth he would be killed. At various times, his head was repeatedly dunked in a bucket of water.

The abuses described above occurred both during periods of interrogation and during periods when no interrogation took place, i.e., after attacks by the Tigers upon army positions, and when army officers had been drinking. During such sessions, the applicant was repeatedly accused of being a Tiger.

On September 18, 1994, the applicant was released after his uncle paid a bribe to a guard. After his release, the applicant went to his uncle's house in Colombo, where he stayed for 8 days. During that 8 days, he only left his uncle's house two times to go to the temple.

On September 26, 1994, three policemen came looking for the applicant at his uncle's house. The applicant's uncle told the policemen that the applicant had returned to his own home. After this incident, the applicant moved to the house of a friend of his uncle, where he remained until leaving Sri Lanka on December 19, 1994. During this time, the applicant contacted a brother who arranged for an agent to meet him in Colombo. The applicant's father-in-law brought him his passport. The applicant gave his passport to his agent at a hotel on October 12 or 13, 1994.

On December 19, 1994, the applicant's agent flew with him to Singapore, where the applicant remained for 6 days. On December 25, 1994, the applicant flew from Singapore to San Francisco, stopping for an hour in Hong Kong. The applicant was detained by Service officers when he arrived at San Francisco because he did not have valid entry documents.

## II. THE IMMIGRATION JUDGE'S DECISION

Although the Immigration Judge found the applicant to be credible, she concluded that the abuse of the applicant by Sri Lankan army personnel "did not rise to the level of persecution contemplated by" the Act. Subsequent portions of the decision indicate that the Immigration Judge, in denying asylum, was not concerned with the level of harm[1] but with the requirement that the motive for the persecution be "on account of" one of the five grounds set forth in the definition of "refugee" in section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994). The Immigration Judge ultimately concluded that the motive for the abuse inflicted upon the applicant was the "ongoing civil strife in Sri Lanka" and, therefore, was not on account of a ground protected by the asylum law.

---

[1] We find that the applicant established by way of credible testimony that he suffered harm sufficient to constitute past persecution, to wit, a 6-month detention, beatings, and other physical and mental abuses at the hands of the Sri Lankan Army.

## III.  ISSUE ON APPEAL

The issue is whether the applicant in this case has demonstrated that the physical and mental torture he endured was inflicted because of political views imputed to him after he had been detained as a suspected Tamil Tiger and, therefore, was "persecution . . . on account of political opinion" under the definition of "refugee" in section 101(a)(42)(A) of the Act.

## IV.  ANALYSIS

### A.  Applicable Standards

An applicant for asylum bears the burden of establishing that he or she meets the "refugee" definition of section 101(a)(42)(A) of the Act. In meeting this burden, an asylum applicant must do more than simply show that he or she was harmed or has a well-founded fear of being harmed. An applicant must demonstrate that the harm was or would be inflicted "on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 101(a)(42)(A) of the Act. Harm arising from general conditions of strife, for example, is not persecution on account of one of the grounds protected under the Act.

Persecution for "imputed" grounds (e.g., where one is erroneously thought to hold particular political opinions or mistakenly believed to be a member of a religious sect) can satisfy the "refugee" definition. *Matter of A-G-,* 19 I&N Dec. 502, 507 (BIA 1987). Notably, the United Nations Handbook on Refugees recognizes that persecution based on political opinion may include situations in which "such opinions have come to the notice of the authorities or are *attributed by them* to the applicant." Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees para. 80, at 19 (Geneva 1979) (emphasis added).

Persecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected under the Act and others not. Proving the actual, exact reason for persecution or feared persecution may be impossible in many cases. An asylum applicant is not obliged to show conclusively why persecution has occurred or may occur. Such a rigorous standard would largely render nugatory the Supreme Court's decision in *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987), and would be inconsistent with the "well-founded fear" standard embodied in the "refugee" definition.

The Board, recognizing the "well-founded fear" standard and the fact that an applicant for asylum may well face difficulty in showing the exact motivation for an act or feared act of persecution, has held that "an applicant does not bear the unreasonable burden of establishing the exact motivation of a 'persecutor' where different reasons for actions are possible." *Matter of*

*Fuentes,* 19 I&N Dec. 658, 662 (BIA 1988). Rather, an asylum applicant "bear[s] the burden of establishing facts on which a reasonable person would fear that the danger arises on account of his race, religion, nationality, membership in a particular social group, or political opinion." *Id*. Thus, in this case the standard for review is whether the applicant has produced evidence from which it is reasonable to believe that the harm was motivated by a protected ground.

This motivation issue involves questions of fact. The applicant, who bears the burden of proof, must present evidence to meet this element of his or her case. Testimonial evidence may in some instances be sufficient on this point, but the availability of supporting documents and corroborative background evidence must be taken into account. *Matter of Dass,* 20 I&N Dec. 120 (BIA 1989). Dependent upon the evidence presented by the applicant, the Service can and should present any available evidence on this issue. *Matter of Fuentes, supra.*

## B. Ninth Circuit Precedent

This case arises within the jurisdiction of the United States Court of Appeals for the Ninth Circuit, which has held in numerous decisions that persecution resulting from erroneously imputed political opinion provides a valid basis for asylum in the United States. *Singh v. Ilchert*, 63 F.3d 1501 (9th Cir. 1995); *Canas-Segovia v. INS*, 970 F.2d 599 (9th Cir. 1992); *Ramirez Rivas v. INS,* 899 F.2d 864 (9th Cir. 1990), *vacated on other grounds*, 502 U.S. 1025 (1992).

Most recently, in *Singh v. Ilchert, supra*, the Ninth Circuit found persecution on account of political opinion in a situation in which Indian security forces detained, tortured, and interrogated an Indian Sikh suspected of supporting anti-government forces. Harpinder Singh was a 24-year-old male native and citizen of India who lived and worked on his family farm. He was not a member of any political party, but claimed to have supported the movement for formation of an independent Sikh state through peaceful means. In April 1991, militant separatists visited his farm and demanded food and shelter. The next month police security forces raided the farm and detained, beat, and interrogated Singh about the militants. This cycle of pressure from militant separatists and then imprisonment and interrogation by the police security forces was repeated in July and August. Singh sought asylum based on a claim of past persecution and well-founded fear of future persecution on account of mistakenly attributed political opinion.

The Immigration Judge and the Board found that the interrogation and abuse was intended to ferret out information in the course of a legitimate investigation and that the applicant had failed to prove that his mistreatment was motivated by mistakenly attributed political opinion. In reversing the Board, the Ninth Circuit found evidence in the record that the persecution

was at least partially motivated by political opinions mistakenly attributed to Singh. The facts of the case indicated that the Indian authorities had reason to believe that Singh was associated with anti-government forces.

In *Singh v. Ilchert, supra*, the Ninth Circuit criticized the Board for "fail[ing] to recognize that persecutory conduct may have more than one motive, and so long as one motive is one of the persecutory grounds, the requirements [as to grounds] have been satisfied." *Id*. at 1509. The Ninth Circuit referred to the Board's own decision recognizing multiple motives, *Matter of Fuentes,* 19 I&N Dec. 658 (BIA 1988), and the following criticism of the Board's restrictive approach by the dissenting opinion in *Matter of R-*, 20 I&N Dec. 621 (BIA 1992):

> [T]he majority . . . implicitly suggest[s] that an alien must prove a persecutorial motivation anchored upon one of the enumerated grounds to the exclusion of all other possible motivations. *Matter of Fuentes*, however, recognized that there can be more than one possible basis for a persecutor's actions. The task of the alien is simply to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds.

*Singh v. Ilchert, supra* (quoting *Matter of R-, supra*, at 629 (Dunne, concurring in part and dissenting in part)).

In determining that Singh had demonstrated to the court's satisfaction "the reasonableness of a motivation related to one of the enumerated grounds," the court examined the history and context of the Sikh separatist movement and the government reaction to that movement. It found evidence in the record of a set of vague and wide-ranging antiterrorism laws in effect in India along with a history of abusive application and enforcement of these laws "to suppress political dissent and stamp out secessionist ideologies." *Singh v. Ilchert, supra,* at 1508.

The court also referred to documentary reports of widespread arbitrary arrest and detention and abuse of persons suspected of affiliation with separatists and found that "a review of [the aforementioned] documents reveals that India defines 'terrorism' so broadly and treats those accused of suspected terrorism so harshly, that police 'investigations' of many suspected terrorists are not legitimate government functions but rather a part of a pattern of political suppression." *Id*. at 1508. Such evidence, when considered in light of the severity of the abuse and the lack of evidence of any legitimate government criminal prosecution of Singh, demonstrated the reasonableness of his assertion that his persecution was premised upon attributed political opinion, one of the enumerated grounds.

The Ninth Circuit held in *Singh v. Ilchert, supra*, that "extra-judicial punishment of suspected anti-government guerrillas can constitute persecution on account of imputed political opinion." *Id*. at 1508. This holding reiterates well-established law in that circuit. *See Maldonado-Cruz v. Dept. of Imm. and Naturalization*, 883 F.2d 788 (9th Cir. 1989); *Blanco-Lopez v. INS*, 858 F.2d 531 (9th Cir. 1988); *Hernandez-Ortiz v. INS*, 777 F.2d 509 (9th Cir. 1985). Under these precedents it is clear that "[i]f there is no evidence of a

legitimate prosecutorial purpose for a government's harassment of a person . . . there arises a presumption that the motive for harassment is political." *Singh v. Ilchert, supra,* at 1509 (quoting *Hernandez-Ortiz v. INS, supra*, at 516).

## C. Proving Motive

As noted above, it is often difficult to determine the exact motive or motives for which harm has been inflicted. There are at least two distinct areas of uncertainty in proving motive. First, in some cases, the events are such that no particular motive is readily ascertainable. For example, an unprovoked attack by unknown assailants may or may not have been for reasons protected by the Act. Without some evidence, either direct or circumstantial, of the reasons for the attack, the applicant will fail to prove eligibility for asylum.

A second area of uncertainty involves the question of motive in situations in which evidence arguably suggests multiple motives. For example, prosecution for an offense may be a pretext for punishing an individual for his political opinion. Similarly, in the instant case, the harm may have been inflicted for reasons related to government intelligence gathering, for political views imputed to the applicant, or for some combination of these reasons.

In adjudicating mixed motive cases, it is important to keep in mind the fundamental humanitarian concerns of asylum law. In enacting the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, Congress sought to bring the Act's definition of "refugee" into conformity with the United Nations Convention and Protocol Relating to the Status of Refugees[2] and, in so doing, give "statutory meaning to our national commitment to human rights and humanitarian concerns." *See* S. Rep. No. 256, 96th Cong., 2d Sess. 1, 4, *reprinted in* 1980 U.S.C.C.A.N. 141, 144. Such an approach is designed to afford a generous standard for protection in cases of doubt.

It is also important to remember that a grant of political asylum is a benefit to an individual under asylum law, not a judgment against the country in question. When the international community was considering the 1967 Refugee Protocol, the U.N. General Assembly made clear that "the grant of asylum by a State is a peaceful and humanitarian act and . . . as such, it cannot be regarded as unfriendly by any other state." Declaration on Territorial Asylum, G. A. Res. 2312 (XXII), 22 U.N. GAOR, Supp. No. 16, at 81, U.N. Doc. A/6716 (1967). A decision to grant asylum is not an unfriendly act precisely because it is not a judgment about the country involved, but a judgment about the reasonableness of the applicant's belief that persecution was based on a protected ground. This distinction between the goals of refugee law (which

---

[2] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 1968 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268; United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150.

protects individuals) and politics (which manages the relations between political bodies) should not be confused in charting an approach to determining motive. While it is prudent to exercise great caution before condemning acts of another state, this is not a reason for narrowly applying asylum law.

In the context of this case, civil unrest in the form of an armed conflict between the separatist Liberation Tigers of Tamil Elam and government military forces has disrupted normal life in Sri Lanka for well over a decade. While a portion of the Tamil population wages a violent campaign to establish a separate Tamil state, the established government of Sri Lanka seeks to maintain the order and the integrity of the state. The conflict has involved serious human rights violations by both sides. In this struggle, only a small portion of the Tamil population is actively engaged in an armed struggle with the Government. Other Tamils may sympathize with the separatist LTTE but disagree with its use of violent tactics. Some Tamils have joined with the Government in taking up arms against the LTTE. *See* Committees on Foreign Affairs and Foreign Relations, 103d Cong., 2d Sess., *Country Reports on Human Rights Practices for 1993,* 1386 (Joint Comm. Print 1994) ("*Country Reports*").

In applying asylum law in the context of the Sri Lankan conflict, it is not an easy task to evaluate an asylum applicant's claim that harm was inflicted because of imputed political views rather than a desire to obtain intelligence information. There may have been, in fact, a combination of these motives. *Matter of Fuentes, supra*. The difficulty of determining motive in situations of general civil unrest should not, however, diminish the protections of asylum for persons who have been punished because of their actual or imputed political views, as opposed to their criminal or violent conduct. As the Court noted in *INS v. Cardoza-Fonseca, supra*, at 444, "Congress has assigned to the Attorney General and his delegates the task of making these hard individualized decisions." That abuse occurred in the context of ongoing civil strife does not answer the question whether the abuse was on account of political opinion.

In evaluating motive in a case in which prosecution for an offense may be a pretext for punishing an individual for his political opinion, the Board would examine a number of factors including "the nature of the crime and the severity of the punishment," as well as the applicant's political opinion, the motives behind his actions, the nature of the act committed, the nature of the prosecution and its motives, and the nature of the law on which the prosecution is based." *Matter of Izatula*, 20 I&N Dec. 149, 157 (BIA 1990) (Vacca, concurring). Evidence that punishment for a politically related act would be disproportionate to the crime would indicate persecution on grounds of political opinion rather than prosecution. *Id.*

In the instant case, there was no prosecution of the applicant. Therefore, the evidence must be evaluated in the context of the ongoing civil conflict to determine whether the motive for the abuse in the particular case was

directed toward punishing or modifying perceived political views, as opposed to punishment for criminal acts; was part of the violence inherent in an armed conflict (i.e., lawful acts of war); or, was motivated by some other reason unrelated to asylum law. As suggested by the analysis in *Singh v. Ilchert, supra,* the following elements, among others, may be considered in identifying motive:

> 1. Indications in the particular case that the abuse was directed toward modifying or punishing opinion rather than conduct (e.g., statements or actions by the perpetrators or abuse out of proportion to nonpolitical ends);

> 2. Treatment of others in the population who might be confronted by government agents in similar circumstances;

> 3. Conformity to procedures for criminal prosecution or military law including developing international norms regarding the law of war;[3]

> 4. The extent to which antiterrorism laws are defined and applied to suppress political opinion as well as illegal conduct (e.g., an act may broadly prohibit "disruptive" activities to permit application to peaceful as well as violent expressions of views);

> 5. The extent to which suspected political opponents are subjected to arbitrary arrest, detention, and abuse.

This is certainly not an exhaustive list of factors to be taken into account in assessing motive. The list merely identifies some of the factors to be considered in the totality of the circumstances.

We pointed out in *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), (in the context of proving a well-founded fear of future persecution) that in addition to establishing the fact that an applicant for asylum has a belief or characteristic offensive to the alleged persecutor, the applicant must prove that the alleged persecutor has the inclination and capacity to punish the alien for that belief or characteristic. Here we must examine the record for direct or circumstantial evidence from which it is reasonable to believe that those who harmed the applicant were in part motivated by an assumption that his political views were antithetical to those of the government.

As indicated in *INS v. Elias-Zacarias*, 502 U.S. 478 (1992), when the issue is whether persecution is "on account of . . . political opinion," an applicant for asylum "cannot be expected to provide direct proof of his persecutors' motives." There the Court specifically stated that "[w]e do not require [direct proof]. But since the statute makes motive critical, [the applicant] must provide some evidence of it, direct or circumstantial." *Id.* at 482-83.

---

[3] *See, e.g.*, Common article 3 of the Geneva Convention which, in the context of civil wars, prohibits "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture" as well as "outrages upon personal dignity, in particular humiliating and degrading treatment." Although the Board has ruled that violations of the Geneva Conventions do not create an independent basis for asylum, *Matter of Medina*, 19 I&N Dec. 734 (1988), there may be situations in which the severity of the violations of the Geneva Convention may support an inference that the abuse is grounded in one of the protected grounds under the asylum law.

In presenting evidence related to the factors listed above, the alien "does not bear the unreasonable burden of establishing the exact motivation of a 'persecutor' where different reasons for actions are possible." *Matter of Fuentes, supra*, at 662. The task of the alien is "to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds." *Matter of R, supra*, at 629 (Dunne, concurring in part and dissenting in part). In some fact situations, the evidence may reasonably suggest mixed motives, at least one or more of which is related to a protected ground. *See Osario v. INS,* 18 F.3d 1017, 1028 (2d Cir. 1994) ("[T]he plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion.")

## D.  Motivation in the Instant Case

In analyzing motive in the context of this case we first note that the State Department Country Reports indicate that the Sri Lankan Army operates under a "Prevention of Terrorism Act" (PTA) and Emergency Regulations (ER), which give security forces wide powers such as preventive and incommunicado detention. "*Country Reports, supra*, at 1389. While noting recent efforts by the Sri Lankan Government to improve its human rights record, the Country Reports indicate that "[m]any Sri Lankans were detained without trial in 1993, though the number continued to decline. Torture and mistreatment of detainees were routinely practiced by both government forces and the LTTE." *Id*. at 1387.

In this case, the record includes no indication that the applicant was charged with any crime. Nor was the harm inflicted during the course of or on the heels of an armed conflict. A suspected guerrilla might understandably be interrogated concerning details of the makeup and location of opposing forces. As time passes, however, harm inflicted is less likely associated with reconnaissance motives.

During his detention and interrogation, the applicant was accused of being an LTTE member and was questioned about the identity and location of LTTE members for whom he had worked. However, the harm inflicted upon the applicant in this case went well beyond the bounds of legitimate questioning for intelligence gathering and continued long after questioning for this purpose had ended. In fact, the record here is clear that the applicant was harmed in situations unrelated to intelligence gathering.

In this case, the Department of State's Bureau of Democracy, Human Rights, and Labor, in a publication entitled *Sri Lanka: Comments on Country Conditions and Asylum Claims* (Jan. 1995), reports that young Tamil males are routinely targeted as suspects in security incidents. This suggests that a young Tamil male captured in an LTTE camp could readily be assumed to have political views antithetical to those of the Government.

Taking into account the context of the Sri Lankan conflict, the information in the State Department Country Reports, and the circumstances, duration

and extent of the abuse inflicted, we find that the applicant has produced evidence from which it is reasonable to believe that those who harmed him were in part motivated by an assumption that his political views were antithetical to those of the Government. The record indicates that the applicant was detained and abused not only to obtain information about the identity of LTTE members and location of their camps but also because the capture of the applicant in an LTTE camp led Sri Lankan authorities to believe that the applicant was a political opponent. Thus, the applicant has met his burden of proving that he was subjected to past persecution in Sri Lanka.[4]

*Matter of B-*, 21 I&N Dec. 66 (BIA 1995), is particularly instructive as to the application of the reasonableness standard in a mixed motive case. The applicant in *Matter of B-* had helped the mujahidin in Afghanistan by posting up mujahidin fliers. The applicant testified that his brother was a member of the mujahidin and that Afghan secret police searched his home to find the brother. Although the brother was away at the time, the authorities found a supply of mujahidin fliers in the home. The agents beat the applicant and his father with the butts of their guns and asked where the applicant's brother was. The applicant and his father were then arrested and taken to secret police quarters. There the applicant was subjected to further interrogation sessions concerning the location of his brother and the source of the fliers. "[T]he first session began with nonviolent questioning about who gave him the mujahidin fliers, where his brother was, and where the mujahidin who supplied the fliers were. The applicant testified that he responded that he did not know, but his interrogators insisted that he did know about the mujahidin because he was helping them. He stated that the KHAD agents thereafter subjected him to sleep deprivation, beatings, and electric shocks applied to his fingers. He said that he was often rendered unconscious by the abuse and would wake up back in his cell. According to the applicant, the interrogations occurred once or twice a week." *Id*. at 67. After 3 months, the applicant was transferred to prison where he was no longer interrogated. After 10 months in prison he was sent involuntarily to the army. *Id*.

The Board had little difficulty in finding that under these facts the applicant in *Matter of B-, supra*, was subjected to past persecution on account of political opinion. The Board reasoned as follows:

> The record indicates that the applicant was arrested in 1988 not only to obtain information from him about his brother, who was a mujahidin member, but also because the discovery of mujahidin fliers in his house led authorities to suspect that the applicant and his father were involved with the mujahidin too. During his interrogation by the [secret police], the

---

[4] In *Matter of T-*, 20 I&N Dec. 571, 577 (BIA 1992), we concluded that in order "to prove persecution 'on account of' one of the enumerated grounds, an alien must do *more than* show mistreatment by the government or a particular group." (Emphasis added.) In this case, the applicant has done so by showing that he suffered mistreatment at the hands of the Sri Lankan Army "on account of" wrongly attributed political opinion. Accordingly, *Matter of T-* is not controlling in this case.

applicant was accused of helping the mujahidin and was questioned about the identity and whereabouts of the mujahidin members who supplied the fliers. After 3 months of interrogation and physical abuse at [secret police quarters], he was transferred to a prison, where he remained for 10 more months before being sent to serve in the army. The applicant's detention and imprisonment for his support of the mujahidin constituted persecution on account of political opinion.

*Id.* at 9.

As in *Matter of B-*, the applicant in the instant case was interrogated and abused because of his suspected support of a separatist group engaged in a military conflict with the government. Although there was interrogation and an attempt to gain information in each case, an additional underlying reason for the abuse was the belief that the victim held political views opposed to the government. Notably, the Board in *Matter of B-* did not become entangled in the impossible task of determining whether harm was inflicted because of the applicant's acts or because of his beliefs underlying those acts. *See also Matter of Izatula, supra* (holding that punishment the Afghan Government might impose on account of support for the mujahidin would be persecution on account of political opinion).

## V.  CONCLUSION

Having established past persecution, the applicant is presumed to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred, conditions in Sri Lanka have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted were he to return. 8 C.F.R. § 208.13(b)(1)(i) (1995). No such evidence of substantial changes in country conditions has been submitted in this case. Large-scale arrests of young Tamil males and abuse of detainees continue to occur. *See Sri Lanka: Comments on Country Conditions and Asylum Claims* (Jan. 1995).

There being no adverse factors of record, we will favorably exercise discretion in this case in order to grant the request for asylum. Because the applicant's asylum application will be approved, we need not address his application for withholding of deportation pursuant to section 243(h) of the Act. *Matter of Mogharrabi, supra*. Accordingly, the following order will be entered.

**ORDER:**    The appeal is sustained. The applicant is granted asylum and admitted to the United States as an asylee.

*CONCURRING OPINION:* Lauri S. Filppu, Board Member; in which Mary Maguire Dunne, Vice Chairman, Michael J. Heilman, and Patricia A. Cole, Board Members, joined.

Asylum claims involving persons who have been abused in their homelands during periods of civil strife often raise difficult issues of fact and law. This case is no exception. It is further complicated because it arises within the

jurisdiction of the United States Court of Appeals for the Ninth Circuit, which has an extensive body of asylum case law that is binding on us.

An alien must be a "refugee" to qualify for asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1994). "Refugee" status requires in part that the past or feared future persecution arise "on account of" a qualifying ground, specifically "race, religion, nationality, membership in a particular social group, or political opinion." Section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1994). It is both the protected characteristic of the victim, and the motivation of the persecutor to harm the victim because of the victim's protected characteristic, that are key to the "on account of" requirement. *INS v. Elias-Zacarias*, 502 U.S. 478 (1992).

As the majority explains, the applicant was captured by the Sri Lankan Army after an attack on a military camp operated by the Liberation Tigers of Tamil Eelam ("Tigers"). The applicant is of Tamil heritage and was discovered in a Tiger bunker in a Tiger camp at the conclusion of an armed engagement. Not surprisingly, the Sri Lankan Army thought he was a Tiger. The applicant was detained for about 6 months, during which he experienced the torture and other abuses described by the majority. He was not prosecuted.

After a detailed review and analysis of the evidence, the majority concludes that the record in its entirety reasonably shows that those who harmed the applicant were in part motivated by political views they attributed to the applicant. It seems, however, that the applicant likely would be considered to be a "refugee" under Ninth Circuit law in any event. It appears that a presumption of politically motivated persecution arises in the Ninth Circuit when, in a civil war context, government forces torture a suspected guerrilla sympathizer and fail to pursue a legitimate investigation or prosecution. *Singh v. Ilchert*, 63 F.3d 1501, 1508-09 (9th Cir. 1995); *Maldonado-Cruz v. Dept. of Imm. & Naturalization*, 883 F.2d 788 (9th Cir. 1989); *Blanco-Lopez v. INS,* 858 F.2d 531 (9th Cir. 1988); *see also Gomez-Saballos v. INS*, 79 F.3d 912, 917 (9th Cir. 1996).[1] The majority's approach may not be wrong under Ninth Circuit law. Its detailed discussion and application of *Singh v. Ilchert,* however, seems unnecessary, unless we first identify evidentiary inferences that would overcome this presumption. Consequently, there is no need to engage in, or to adopt, the majority's analysis in order to find the applicant eligible for asylum.

## DISSENTING OPINION: Fred W. Vacca, Board Member

I respectfully dissent.

I am amazed that in a case where credibility is a most crucial factor, neither the decision of the majority nor the concurring opinion address in meaningful terms the plausibility and believability of the applicant's asylum

---

[1] Singh v. Ilchert, *supra*, at 1509, indicates that at least this aspect of those earlier decisions has survived the Supreme Court's ruling in *INS v. Elias-Zacarias, supra*.

claim. In my view, the applicant's testimony is untruthful as to his status at the time he was seized by the Sri Lankan Army. I find this to be determinative of the applicant's asylum claim. Unlike the majority's decision, which contains a terse footnote in which it finds the applicant's testimony credible, and the concurring opinion, which is silent on the subject, I have examined and evaluated the applicant's testimony to determine its veracity. As a starting point, I reviewed the Immigration Judge's decision to determine how she treated the issue of credibility. I note that the applicant is the only witness who gave testimony in these proceedings. In the second full paragraph of page 5 of the Immigration Judge's decision, I find the singular reference to the credibility of the applicant. The Immigration Judge stated as follows:

> After carefully observing the demeanor of the Applicant and considering his testimony, the Court believes that what he testified to *may* have happened the way he says it did and, of course, the Court will not impugn his character in any way. (Emphasis added.)

This finding of the Immigration Judge is ambiguous, tentative, and less than helpful to me in determining the truthfulness of the applicant's testimony. The Immigration Judge gave no reasons, either analytical or specific, for her conclusions and leaves this member wondering what she observed or relied upon in making her findings. The alien submitted copies of various news clippings and reports of country conditions in Sri Lanka which have been made a part of the record. However, the applicant did not offer the testimony of other witnesses, nor is there specific corroboration of his testimony. Therefore, the applicant's asylum claim rises or falls depending on the truthfulness and materiality of his testimony.

The applicant is a 34-year-old ethnic Tamil male who tells a story of being a married man and a welder by trade who lived and worked near Elali in the northern part of Sri Lanka. He claims that sometime after November of 1993 he was physically taken under duress by members of a guerrilla organization known as the Liberation Tigers of Tamil Eelam ("LTTE" or "Tigers") to a clandestine Tiger camp in a rural area of northern Sri Lanka for the purpose of performing forced labor, i.e., welding, in the service of the guerrillas. He testified that in March of 1994, the Tiger camp was overrun in a military assault by soldiers of the Sri Lankan Army. Because of the incoming shells, presumably mortar, and rifle fire, he stated that he sought protection in one of the bunkers built in the Tiger camp. He informed the Immigration Judge that he was discovered hiding in the bunker by 50 or more soldiers who took him and 12 other young Tamils who also were hiding in bunkers and brought them to an army encampment where they were beaten and interrogated. Interestingly, at least three times during his testimony, he referred to being "caught" by the Sri Lankan soldiers. The applicant further testified that he was later transferred to an army prison in or near Colombo, the capital of Sri Lanka, and further beaten, threatened with rifles, and choked in a room filled with irritating smoke from burning chilis. During the entire period of 6

months he was asked specific questions about his involvement with Tamil Tigers and the Tigers' operations. He claims that he was released from the army's detention after his uncle paid a substantial bribe to one of the soldiers.

Overall, I find that his testimony is lacking in important detail. Absent from his testimony were any details of the daily routine of the Tiger camp, how many Tigers were present in the camp, and what he observed of guerrilla activities and operations. There is little or no information about his alleged fellow captives, i.e. the 12 young Tamils found hidden in the bunkers. There is also no specific information about the identity and behavior of the Tamil Tigers. The applicant was silent as to whether Tigers fled or were caught in the army assault on the camp. He testified that he only saw the other 12 "forced laborers" after the assault. Presumably he was held captive by the Tigers from November 1993, when he was taken from his home, to March of 1994, when the soldiers "caught" him. I know precious little of what happened between these two events.

In the course of his testimony the applicant revealed that this brother was a Tiger from 1983 to 1987. The applicant would have you believe that, despite the compromising circumstances of his presence and capture in a clandestine Tiger camp, he was *not* a Tiger, but a prisoner of the Tigers: one who was forced by the Tigers to act as a slave for them by performing welding tasks. The applicant would ask you to ignore the fact that in profound ways he meets the exact profile of a Tamil Tiger. He is an ethnic Tamil, a male, and one who fits the age description of a Tiger. Especially noteworthy is the fact that the applicant comes from a region which is heavily concentrated with Tigers. Indeed, the applicant's brother was a Tiger. The applicant testified that his brother terminated his membership in the Tigers in 1987. Would a guerrilla group as violent and as fanatical as the Tigers permit the applicant's brother to unilaterally quit the Tigers? In an area where many young Tamil males, including the applicant's brother, were recruited by the Tigers, one has to ask why the Tigers overlooked recruiting the applicant. According to the applicant's testimony, the Tigers knew of him and where he lived and worked. Why would they take him as a forced laborer and not recruit him as a Tiger. The applicant testified that while in the Tiger camp he was unrestrained and treated well by the Tigers. He testified that he was watched while in the camp to see that he and other slave laborers did not escape. If that is the case, where were the guards at the time of the army assault on the camp? In fact, where were the Tigers? The applicant testified that at the time of the army assault, he was captured along with 12 other slave laborers. He did not mention whether Tigers were in the camp or whether they were captured by the Sri Lankan soldiers. Did the Tigers leave the slave laborers alone in the camp before the assault? Did the Tigers successfully flee the camp at the time of the assault, leaving the laborers to fend for themselves, or were the applicant and the young Tamils who were found hiding in the bunkers of the Tiger camp actually Tigers?

The applicant and the other young Tamils were taken prisoner, interrogated at a local army camp, and then transferred to a central army prison in Colombo. The subject of the ongoing interrogation of the applicant was the Tigers. He was believed to be a Tiger and was treated as one. The army was most interested in knowing the identity of other Tigers and everything that the applicant could tell them about the Tiger organization and its operations.

I have reviewed the transcript of the minutes of the hearing and examined the testimony of the applicant from start to finish. In my view, the applicant's denial that he is a Tiger is highly implausible and not believable. When the elements of his story are examined, it is logical and reasonable to infer that he is indeed a Tiger who was caught by the Sri Lankan Army in the most compromising and compelling circumstances. In such circumstances, the applicant has the burden of coming forward with evidence to show that he is not a Tiger. Apart from his repeated denials, he did not submit evidence that would demonstrate that he is not a Tiger. The applicant's denial is contrary to every aspect of what is known abut the Tigers and their activities.

The Tamil Tigers are an insurgent organization in Sri Lanka that engages in violent terrorist activities. Its targets are military and police personnel and installations in the northern and eastern regions of Sri Lanka. However, it also is responsible for the killing, maiming, and displacing of thousands of Sinhalese and Muslims in the civilian population. These terrorist activities began in 1983. In 1991, two bombings in Colombo left the State Defense Minister and scores of civilians dead. Also during 1991 the bodies of more than 300 police, previously captured by the Tigers in June 1990, were found. The Tigers, with use of anti-personnel mines, caused indiscriminate death or injury to many persons in the northeast. In 1993 a Tiger suicide bomber assassinated the President of Sri Lanka and 23 others at a public rally. The most recent information from the Country Reports published by the Department of State for the Congress reveals that the Tigers continue to kill Sinhalese and Muslims and use torture on a routine basis. *See* Committees on Foreign and International Relations, 104th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1995* 1352 (Joint Comm. Print 1996).

Clearly, the Tigers are a terrorist guerrilla organization. They target the Government of Sri Lanka and terrorize and persecute the Sinhalese and Muslims in Sri Lanka as well. The applicant has failed to come forward with evidence to show that he is not a Tiger. Having found the applicant to be a Tiger, I conclude that the applicant is ineligible for asylum and withholding of deportation as one who is a member of a terrorist group that ordered, incited, assisted or otherwise participated in the persecution of persons on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* section 243(h)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(2)(A) (1994); *Fedorenko v. United States,* 449 U.S. 490 (1981); *Matter of McMullen*, 19 I&N Dec. 90, 96 (BIA 1984); *Matter of Fedorenko,* 19 I&N Dec. 57 (BIA 1984); 8 C.F.R. § 208.13(c) (1995).

Accordingly, I would deny the applications for asylum and withholding of deportation and dismiss the appeal.