# In re E-P-, Applicant

*Decided March 14, 1997*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) A finding of credible testimony by an asylum applicant is not dispositive as to whether asylum should be granted; rather, the specific content of the testimony, and any other relevant evidence in the record, is also considered.

(2) When evaluating an asylum claim, the changed conditions of the country at issue, as properly established in the record of proceedings, may be a significant factor in concluding that an applicant has not established a well-founded fear of persecution.

FOR THE APPLICANT: Candace L. Jean, Esquire, Miami, Florida

BEFORE: Board En Banc: DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, and GUENDELSBERGER, Board Members. Dissenting Opinions: SCHMIDT, Chairman; ROSENBERG, Board Member.

HURWITZ, Board Member:

In a decision dated February 1, 1996, an Immigration Judge found the applicant excludable as charged, denied her application for asylum and withholding of exclusion and deportation to Haiti, and ordered her excluded and deported from the United States. The applicant subsequently filed this appeal, which challenges the denial of her application for asylum and withholding. The appeal will be dismissed.

## I. APPLICABLE LAW

An applicant for asylum and withholding of exclusion and deportation has the burden of proof to establish that he or she has been subject to past persecution, has a well-founded fear of persecution, or has established a clear probability of persecution within the meaning of sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1994). *See generally INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987); *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).

An applicant must show that the harm suffered, or feared in the future, was or would be inflicted on account of his or her race, religion, nationality,

membership in a particular social group, or political opinion. See section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994) (defining the term "refugee"); *see also* 8 C.F.R. § 208.13 (1996). It is recognized that some cases involve possible mixed motives for inflicting harm; therefore, an asylum applicant is not obliged to show conclusively why persecution has occurred or may occur. *See Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996). The task of the alien is to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds. *Id.* at 494-95 (quoting *Matter of R-*, 20 I&N Dec. 621, 629 (BIA 1992) (Dunne, concurring in part and dissenting in part)).

## II. EVIDENCE

The applicant is a 35-year-old native and citizen of Haiti. She arrived in the United States on October 20, 1992. The applicant's excludability is not at issue. The applicant filed a Request for Asylum in the United States (Form I-589).[1] She also provided documentary evidence of country conditions in Haiti to support her claim.

The applicant testified that the Haitian military wanted to harm her and an uncle because of their church membership. The military and their supporting forces were interested in the church because it supported Jean-Bertrand Aristide for president. As of October 1991, the military would watch the church to see who attended services. That month, the military shot at members while they were leaving the church. The applicant had been informed that this action would be taken, and therefore she left the church before the shooting began.

The applicant also testified that her uncle and two cousins were murdered in their house by the military on October 12, 1991. They were targeted because they supported Father Aristide and were members of a group she referred to as "F.N.C.D." The applicant was in the house at the time of the murder, but was in a separate room. No one approached her at that time. The applicant left Haiti because she believed her life was in danger due to her relatives' activism and her church membership. The applicant's daughter currently resides in Haiti with the applicant's sister.

The applicant submitted several news reports and releases regarding the current conditions in Haiti. She also provided a report from the Human Rights Watch, which addressed conditions in Haiti after the return of President Aristide in October 1995. The record further contains an advisory opinion from the United States Department of State, Asylum Office, Bureau of

---

[1] At the hearing, the applicant stated that there were three errors in her asylum application. The errors included her departure date from Haiti and a statement that the applicant's sister had been raped and tortured by the police. The latter event never occurred. Finally, the applicant clarified that two of her cousins had been murdered, not three, as was listed on in the application.

Democracy, Human Rights, and Labor. *See generally* 8 C.F.R. § 208.11 (1996) (allowing the Immigration Judge to consider the State Department opinion in evaluating an asylum claim).

## III. ANALYSIS

The Immigration Judge found the applicant's testimony to be credible. We adopt this finding. *See generally Matter of Burbano*, 20 I&N Dec. 872 (BIA 1994); *Matter of Fefe*, 20 I&N Dec. 116 (BIA 1989). However, a finding of credible testimony is not necessarily dispositive. The specific content of the testimony, and any other relevant evidence in the record, is also considered. In the current case, we agree with the conclusion of the Immigration Judge that the applicant did not meet her burden of establishing that she was eligible for asylum.

Initially, we note that as a whole, the applicant's testimony was vague and lacking in specific detail. *Cf. Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); *Matter of B-*, 21 I&N Dec. 66 (BIA 1995). Further, the testimony did not provide a sufficient nexus between the applicant's fear of harm and one of the five enumerated grounds. *See generally Matter of S-P-, supra.*

The applicant stated that outside of attending church, she was not involved in any groups or political activities. She presented no testimony that the military had any interest in her due to her relatives' F.N.C.D. affiliation. Therefore, we see no basis for a claim based on political opinion or one imputed from the applicant's politically active relatives. In this regard, we do not discount the tragedy of the murder of these family members. However, the applicant was present in the house, and she did not indicate that she was harmed or approached at that time. The applicant did not present evidence that she was further sought out by these forces after the murder. The lack of evidence in this area undermines a claim of past persecution, or a well-founded fear of persecution, on account of these events.

Regarding her church membership, the applicant indicated that she was watched by the military in Haiti because her church was anti-government. However, as found by the Immigration Judge, her claims of being watched while coming out of the church were very vague and general. She has not set forth a basis to establish why the persons previously observing the church had a specific knowledge of her name at that time, or in the years that have passed.

Furthermore, the change in government and increasing stability as noted below militates against a finding that the applicant has a well-founded fear of persecution. In September 1994, the Armed Forces of the United States entered Haiti acting under the auspices of the United Nations. Subsequently, the military government of Haiti relinquished authority and the elected civilian government of the formerly deposed president, Jean-Bertrand Aristide, was restored. Thereafter, American forces in Haiti were supplanted by a multinational U.N. peacekeeping force.

As noted in the *Profile of Asylum Claims & Country Conditions* by the Department of State submitted at the hearing, in the months following the intervention by American forces in Haiti, "the human rights situation in Haiti has vastly changed from that during the three prior years of military domination." Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Haiti - Profile of Asylum Claims & Country Conditions* Part Two, I. (Sept. 1995) [hereinafter *Profile*].

Moreover, the transformation of the situation in Haiti has continued. On February 7, 1996, Rene Preval was sworn in as Haiti's new President, replacing Jean-Bertrand Aristide in the first democratic presidential succession in Haiti's turbulent history. The political changes in Haiti, which include the gain of power by those whom the applicant supports, is a significant factor in our conclusion that the applicant has not established a well-founded fear of persecution.

The applicant did submit evidence to establish that her fear of returning to Haiti is well founded, despite the changes in the country since her 1991 departure. Most notably, the evidence in question states that the Haitian people are still subject to economic, social, and political unrest. It is further reported that paramilitary structures remain a potential threat. *See, e.g.,* 7 Human Rights Watch/Americas, National Coalition for Haitian Refugees, *Haiti: Human Rights After President Aristide's Return*, No. 11, at 17-18 (Oct. 1995).

In considering the change of conditions in Haiti since the applicant's departure, this Board is not concluding that Haiti is an untroubled country. However, the rise to power by democratic forces, and the significant efforts made to dismantle the former military structures, have a direct impact on asylum claims from Haiti. This includes the applicant's claim, which is based on her status as a member of the general population who supported President Aristide.[2] We therefore do not find adequate evidence to support a finding that the applicant has suffered past persecution, or has established a well-founded fear of persecution, within the meaning of the Act.[3]

Inasmuch as the applicant has failed to satisfy the lower burden of proof required for asylum, it follows that she has also failed to satisfy the clear probability standard of eligibility for withholding of deportation. The evidence does not establish that it is more likely than not that the applicant would be subject to persecution on account of one of the five grounds

---

[2] It remains possible that an Aristide supporter could establish a well-founded fear based on that status. Such an asylum applicant would need to provide specific facts as to why he or she would be persecuted despite the change in government.

[3] We note that it is well established that general conditions of civil unrest which affect the populace as a whole are not sufficient to establish a basis for asylum. *See Matter of S-P-, supra; see also Matter of Sanchez and Escobar,* 19 I&N Dec. 276 (BIA 1985), *aff'd sub nom. Sanchez-Trujillo v. INS,* 801 F.2d 1571 (9th Cir. 1986).

specified in section 243(h) of the Act. *See INS v. Cardoza-Fonseca, supra; Matter of Mogharrabi, supra*. Accordingly, the appeal will be dismissed.

**ORDER:** The appeal is dismissed.

Board Member Gustavo D. Villageliu did not participate in the decision in this case.

*DISSENTING OPINION:* Paul W. Schmidt, Chairman

I respectfully dissent.

There are two issues in this case: (1) whether the applicant has an objective basis for fearing persecution on account of imputed political opinion if returned to Haiti; and (2) whether country conditions in Haiti have changed so as to eliminate any objective basis for fearing persecution on account of imputed political opinion. I find in favor of the applicant on issue (1) and would remand the case for a further evidentiary hearing on issue (2).

## I. OBJECTIVE BASIS FOR FEAR

The applicant is a supporter of former Haitian President Aristide. She established through credible testimony that she was in the house at the time her uncle and two cousins were murdered by Haitian military authorities on October 12, 1991. She has further established that her murdered relatives were activists in a pro-Aristide/anti-military group known as F.N.C.D.

The incident described by the applicant would give a reasonable person in her position an objective basis (that is, a 10 percent chance) to fear persecution on account of imputed political opinion. *See INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). The objective basis for the applicant's fear is not eliminated just because she was not killed or harmed on the spot by the military.

Perhaps, as implied by the majority, the murderers made a conscious decision not to harm the applicant because she was not sufficiently politically active and, therefore, was not perceived as a serious political threat. However, it is also possible to believe that the persecutors perceived the applicant as a political opponent and simply decided to deal with her at a later date or wanted to increase the applicant's terror and mental anguish by giving her some time to suffer from the murder of her relatives, or that they would change their collective mind and later decide to harm the applicant because of her pro-Aristide, activist family affiliations. Because persecutors do not necessarily operate with perfect efficiency, I do not find the fact that the applicant was not harmed prior to her departure from Haiti, 1 year later, to be determinative.

A reasonable person in the applicant's position would not necessarily believe that just because she escaped once, she was "home free" from any future politically inspired harm at the hands of the military authorities who had killed her relatives. In such situations, the applicant does not bear the

burden of establishing exactly what the persecutors intended. *Matter of S-P-*, 21 I&N Dec. 486, 494 (BIA 1996). The applicant made a prima facie showing of a well-founded fear of persecution on account of imputed political opinion, as required for a grant of asylum.

## II.  CHANGED COUNTRY CONDITIONS

The remaining question is whether the applicant's well-founded fear of persecution is eliminated by changes in country conditions in Haiti since her departure in 1992. The majority acknowledges that the applicant submitted some evidence supporting her claim of a continuing well-founded fear of harm at the hands of paramilitary authorities. Nevertheless, the majority basically finds the record evidence sufficient to establish a general rule that conditions in Haiti have changed to the point where, at present, most supporters of former President Aristide within the general population of Haiti have no objective basis for fearing political persecution.

I have some reservations about whether the record supports the majority's blanket rule. However, assuming that rule to be correct, I am not certain how it applies to this applicant's case.

In some ways, the applicant may be considered like a general Aristide supporter in that she was not particularly politically active. On the other hand, the applicant shares some attributes with more highly visible Haitian political activists. She is a member of a family of known activists who were specifically targeted for murder by the military authorities who formerly ruled Haiti. It simply is not clear to me from this record that members of the former military regime are under control by the current government to the point where no reasonable person whose family had been targeted in the past could have an objective basis for fearing future politically motivated harm.

Therefore, I would remand the case for the record to be updated on current conditions in Haiti and to permit additional testimony and evidentiary submissions on whether there is a continuing objective basis for the applicant's fear.

## III.  CONCLUSION

I conclude that the applicant has established a prima facie case of a well-founded fear of persecution in Haiti on account of imputed political opinion. I would remand the record for a determination of whether changes in country conditions in Haiti since the applicant's departure have extinguished the objective basis for her fear. Consequently, I respectfully dissent from the decision to dismiss the applicant's appeal.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

Reading the majority's decision, from a point of view most favorable to the applicant, we learn that the applicant was an active member of her church in Haiti, which supported Jean Bertrand Aristide before his presidency and during the tumultuous months prior to his unlawful ouster by the former military. *Matter of E-P-*, 21 I&N Dec. 860, 861 (BIA 1997). She was similar to other churchgoers in the commingling of her support for democracy and opposition to the military with her church participation. Apparently she and her uncle and other churchgoers were under surveillance by the former military and its supporters on account of their pro-Aristide views. However, she was different from other churchgoers because it appears that her uncle and two cousins also were active in the F.N.C.D.[1] *Matter of E-P-, supra*, at 861.

Sometime in October 1991, the military insurgents shot at the church members as they were leaving the church, but the applicant managed to escape harm because she was aware of the impending attack and left the premises early. *Matter of E-P-, supra*, at 861. On October 12, 1991, the military broke into her home and shot her uncle and two cousins, killing them. *Id*. Although the applicant was in another room and was not "approached," she was witness to this massacre of her pro-Aristide family. *Id*. at 861. She fled the country because she felt her church membership and her uncle's activism placed her in danger, leaving her daughter behind in the care of her sister.

But that is not the entire story. In addition to the lack of any detail in the majority's summary of the evidence or the reasoning that follows, the overly general factual framework on which the majority bases its decision is incomplete and inaccurate. An accurate recitation of the facts on the record, and a reasonable assessment of both the individual experiences which precipitated the applicant's fight in Haiti and the present conditions in that country today, supports a different telling, a different analysis, and a different result than that contained in the majority opinion.

## I.  APPROACH TO ASYLUM ADJUDICATIONS

I have a different reading both of the actual facts and the applicable law in this case. Not surprisingly, my analysis differs sharply from that of the majority and I would reach a different result. Of course, adjudication of the facts contained in an asylum application is always to some extent in the "eye of the beholder," just as interpretation and application of the law may appear to be equally malleable by the adjudicator.

However, in the asylum context, we have specific legal principles and authorities which exist to resolve such potential variations or tendencies in construing the facts. *See Matter of S-M-J-,* 21 I&N Dec. 722 (BIA 1997) (finding that the benefit of the doubt is to be extended to an asylum applicant

---

[1] The F.N.C.D. is the pro-Aristide party, as made apparent by the evidence of record. *See* Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Haiti—Profile of Asylum Claims & Country Conditions* (Sept. 1995) [hereinafter *Profile*].

who may be unable to substantiate his statements, but whose testimony is generally credible and does not run counter to generally known facts, and citing the *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1992)("*Handbook*"));[2] *see also Matter of Pula*, 19 I&N Dec. 467, 476 (BIA 1987) (Heilman, concurring) (recognizing that asylum provisions are humanitarian in their essence and that the "normal" immigration laws cannot be applied in their usual manner to refugees); *Matter of Joseph*, 13 I&N Dec. 70, 74 (BIA 1968) (stating that the applicant must have a "reasonable opportunity" to present his proofs for the "stakes are high"); *Matter of Sihasale*, 11 I&N Dec. 531, 532-33 (BIA 1966) (holding that the asylum applicant's testimony must be accorded the most careful and objective evaluation possible, as it may be the only evidence available).

A full and fair adjudication presumes that we completely and reasonably construe the specific facts presented by the applicant, and that we understand and apply the applicable legal standards to the applicant's claim. Critical considerations in any asylum adjudication are the statute,[3] the regulations, and the precedent decisions of this Board, both unanimous and divided. Also of importance are the decisions of circuit courts, the views of academics, scholars, and nongovernmental organizations, entities which have reviewed the statute and our decisions and have opined as to interpretation and application of the asylums laws, and the interpretation of the *Basic Law Manual* of the Department of Justice. *See Matter of S-M-J-, supra; Matter of H-*, 21 I&N Dec. 337 (BIA 1996); 8 C.F.R. § 208.12 (1996); INS, U.S. Dept. of Justice, *Basic Law Manual, U.S. Law and INS Refugee/Asylum Adjudications* in 8 Charles Gordon et al., *Immigration Law and Procedure* (Matthew Bender rev. ed. 1996). The Department of State also is charged with offering a profile of prevailing conditions in the country from which the applicant is seeking

---

[2] The *Handbook* provides practical guidance to government officials as they are determining refugee status under the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which was enacted to bring United States refugee law into conformance with our international obligation of nonrefoulement under the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 ("Convention"), and the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967 [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 137 ("Protocol"). *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987); *Matter of Q-T-M-T-,* 21 I&N Dec. 639 (BIA 1996) (Rosenberg, dissenting); *Matter of Rodriguez-Palma*, 17 I&N Dec. 465, 468 (BIA 1980).

[3] This includes the 1951 Convention and 1967 Protocol, containing the internationally accepted principles which we have adopted in the course of acceding to the Protocol, applying Articles 2 through 34 of the 1951 Convention. Protocol, *supra*, art. 1, para. 1; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987)(stating that "[i]f one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the [Protocol].")

asylum, and may provide more individualized comments at its option. 8 C.F.R. § 208.11 (1996).

## A. Understanding the Facts of the Applicant's Claim

Is the applicant the "church lady"? Or has she been politically active in her church membership—someone who holds a political opinion, who has a valid and surviving well-founded fear of persecution? Or is she someone who, based on her own beliefs and church involvement, and her associations with her activist pro-Aristide relatives, has had a political opinion attributed to her?

## 1. Accurately Reading the Facts as Presented

Before we can fairly make that assessment, we need to get the facts straight. I do not mean understanding the import of the facts given the context in which they occurred—I mean basing our decision accurately and fully on the actual facts contained in the record. Our precedent is unequivocal in requiring that the asylum applicant's testimony must be accorded the most careful and objective evaluation possible, as it may be the only evidence available. *See, e.g., Matter of Sihasale, supra.*

The majority got the facts wrong and the majority failed to get all of the facts. These errors by the majority are prejudicial, as they skew the basis for its conclusion that the applicant failed to meet her burden of proof. *See Martinez-Benitez v. INS*, 956 F.2d 1053, 1055-56 (11th Cir. 1992) (finding the Board to have acted arbitrarily in ignoring a factual disparity in the record pertaining to asylum eligiblity, which prevented it from assigning proper weight to this factor in the decision-making process). First, an accurate report of the facts provides a much more coherent picture of the applicant's situation. Second, the applicant's testimony is far more detailed than the majority's description indicates.

What the transcript and the decision of the Immigration Judge reveal is that the applicant had several relatives whose activities, affiliations, and circumstances are important considerations. Contrary to the majority's vague reference to an uncle, there were two uncles: one, who, along with her two cousins, was an Aristide activist and resided in the same home as the applicant; and the other, with whom she attended church. The applicant's Request for Asylum in the United States (Form I-589), which was accepted as corrected at the hearing, indicates that at least the former three of these relatives were local leaders in the F.N.C.D. and that meetings of pro-Aristide activists and community members appear to have been routinely held at the applicant's house. The applicant also testified that the first uncle was in "Lavalas" (meaning the flood or wave of humanity or change), a term used to refer to the pro-Aristide, pro-democracy forces.

In addition, the applicant herself held a political opinion in support of Aristide and in opposition to the military, which she expressed in the context of her church activities. She was accompanied in these activities by the second uncle. She testified to the nexus between her involvement in the church and the political and social causes to which the first uncle and her two cousins dedicated themselves, and stated that, in fact, it was for the same cause. She testified that the military constantly watched the activities at the church in an effort to intimidate and suppress the churchgoers' expressions of support for Aristide. She explained further that the prayers said in church were actually calls for democracy under Aristide's leadership, and that these prayers were loudly and publicly expressed.

She stated that she lived in a house with her uncle and two cousins, and with her sister and her own young son. She later specified that her sister was, at that time, only a teenager, no more than 12 years old. She described fully the incident in which the first uncle and her cousins were massacred. She stated that the attack occurred on October 12, 1991, and that it was at night; she was in the house in her room, with her sister and her child. She indicated that, although she did not see them, the attacking military apparently broke down the door on their way in or their way out. They shot her uncle and cousins dead and left without penetrating the house any further. She did not know why they did not come into her room to get her, but explained that her sister was only a preadolescent child.

Furthermore, contrary to the contention in the majority opinion, she testified that the military *did* come after her personally following their attack on her home and the killing of her relatives. In particular, in contrast to the sequence of events suggested by the majority's recitation of the evidence, it was *then* that the military went a step further than merely watching those who attended church services to intimidate them. They actually came after her and her surviving uncle, stepping up their intimidation of the pro-democracy, pro-Aristide churchgoers, and actually shooting at them. This was not a random, spontaneous attack, as the applicant was warned of it, indicating it was planned in advance. She testified further that the military was pursuing her and her uncle. In response, the applicant fled with her sister and child to a rural area where she hid (her application form indicates she "hid under the bed") until she could escape. Her teenage sister and child remained, but remained in hiding.

After all was said and done, the Immigration Judge found this testimony to be credible, and the majority has concurred in that finding. It baffles me how the majority can claim to give a fair reading to this record when their statement of the facts does not make clear that they have grasped either the existence of two different uncles, or the fact that the shooting at the church occurred after the killing of her relatives. *Martinez-Benitez v. INS, supra; Matter of Sihasale, supra*. I also find it difficult to rationalize how the majority can characterize the evidence presented as "vague and general" and rely

on this alleged lack of detail to find that the applicant failed to meet her burden of proof, when the majority fails to fully or accurately relate the evidence presented.

## 2. Fairly Interpreting the Facts Presented

Next, we must examine the interpretation of the actual facts presented. Hasn't the applicant provided evidence that substantiates that her fear is well-founded? Remember: she is a church-going woman who is a supporter of Aristide, a former priest, not only carrying all the religious accoutrements of his former calling, but embodying a controversial movement for democracy that threatened to topple the corrupt, military-dominated political structure in Haiti. She found herself barely escaping being fired upon by the military at church, where she regularly participated in religious and political activities. Then there is the fact that she lived with her uncle and cousins who had known F.N.C.D and Lavalas political affiliations, and the shooting incident followed the invasion of the applicant's home and her relatives' murders by the same military forces.

The applicant is not merely an Aristide proponent who has been frightened by general violence that occurred during his ouster. Her relatives held F.N.C.D meetings at her home; they apparently were local leaders of the F.N.C.D. and were engaged in open and public political activity, organizing and agitating people to vote for Aristide, to support democracy, and to oppose the military and former government. She herself publicly "prayed" for Aristide and democracy to replace the military, thereby openly seeking the demise of a system dominated by those who surrounded the church with weapons.

The majority describes this situation thus: "[O]utside of attending church, she was not involved in any groups or political activities." Given that the movement in Haiti in support of former Father Aristide was a church-based movement, on what legitimate basis does the majority dismiss the applicant's lack of activity outside of church? Furthermore, by omission, the majority apparently dismisses the political opinion which was very likely imputed to the applicant as the result of her affiliation with the church, her association with her uncle in church activities, and her family relationship to her other uncle and the cousins who were killed.

The majority then dismisses the applicant's own brush with death in which she witnessed, at least by hearing it, the door to her home being broken down and her uncle and two cousins shot to death. They inexplicably glossed this over, "No one approached her at that time," *Matter of E-P-, supra*, at 861, reiterating further on in their opinion that the applicant did not indicate she was "harmed or approached at that time." *Id*. at 862. Under what authority does the majority require the applicant to endure personal, physical harm in the face of the murder, within the applicant's earshot, of her family members,

or require her to definitively explain the reasons for the military's actions in not then seeking to kill her?

The majority never explains the significance of this finding, or the factual or legal relevance of its (erroneous) comment that the applicant did not present evidence "that she was further sought out by these forces after the murder." *Id*. at 4. Its reliance on the fact the applicant was not harmed does not, under any authority cited or of which I am aware, undermine a potential basis for finding past persecution to have occurred, or support the conclusion that the applicant's fear is not well-founded. And, as the record reveals, the majority's assumption that the applicant was never sought by those who attacked her relatives is plainly wrong.

## B. Applying the Proper Legal Standards to the Applicant's Claim

At the outset, I must differ with my colleagues' understanding of the applicable law as expressed in their opinion. The majority states that they recognize that since some cases involve possible mixed motives for harm, "therefore" the asylum applicant is not required to show conclusively why persecution has occurred or may occur. *Matter of E-P-, supra*, at 861. Although arguably related, there is a difference between the principle that an applicant does not bear the burden of showing the exact reason for persecution, and the principle that an applicant may establish eligiblity under a mixed motive standard.[4] *See, e.g., Bolanos-Hernandez v. INS*, 767 F.2d 1277 (9th Cir. 1985) (recognizing that persecutors are not likely to provide their victims with evidence of their motives). The *Handbook* specifically recognizes, as have we, that often the applicant himself may not be aware of the reasons for the persecution visited upon him or feared. *Handbook, supra*, para. 66, at 17; *see also Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996).

This is not a "mixed motive" case as were, arguably, our recent precedent decisions in *Matter of C-A-L-*, 21 I&N Dec. 754 (BIA 1997); *Matter of T-M-B-*, 21 I&N Dec. 775 (BIA 1997); and *Matter of V-T-S-*, 21 I&N Dec. 792 (BIA 1997). In those cases the question was whether another possible consideration motivating the persecutors' actions against the victim eviscerated the possibility of the persecutor being motivated by a desire to overcome a political or religious difference. *See INS v. Elias-Zacarias,* 502 U.S. 478 (1992) (recognizing that a persecutor may be motivated to harm the victim for more than one reason); *Matter of S-P-, supra*. This is a case in which the issue is the extent to which an asylum applicant must demonstrate that her

---

[4] I cannot but take to heart the concerns recently articulated, and not for the first time, that in such life and death matters in which we are supposed to have expertise, the Board must strive for clarity and exactitude, not only in expressing our reasoning, but in our understanding of the law that governs our adjudications. *See, e.g., Marquez v. INS*, 105 F.3d 374 (7th Cir. 1997); *Rodriguez-Ramon v. INS*, 98 F.3d 416 (9th Cir. 1996); *Osorio v. INS*, 18 F.3d 1017 (2d Cir. 1994).

credible subjective fear is plausible, or grounded in reality, in order to meet her burden of proof. In other words, the question here is the straightforward, classic one of whether the applicant's fear of harm on a protected ground is reasonable. I find that it is. *INS v. Cardoza-Fonseca, supra.*

Another less explicit, but equally erroneous, presumption, which I believe underlies the majority's conclusion that the applicant has not established a well-founded fear of persecution, involves the applicant's evidentiary burden. Credibility concerning individual fears or events particular to the individual applicant is not diminished or called into question by the absence of corroboration; rather, if unrefuted and credible, testimony alone is perfectly adequate to satisfy the applicant's burden of proof of a threat. *Matter of S-M-J-, supra; Matter of H-, supra*; 8 C.F.R. § 208.13(a) (1996).

The applicant was found credible by the Immigration Judge and by the majority. If any aspect of this appeal is "vague and lacking in specific detail," *Matter of E-P-, supra*, at 862, it is the majority's reasoning in support of their conclusion that the applicant's evidence is not adequate to demonstrate that it is reasonable to believe that the military seeks to harm her on account of her actual or perceived political opinion. We have held that testimony which is "believable, consistent and sufficiently detailed" *alone* will suffice to satisfy the alien's burden. *Matter of Mogharrabi*, 19 I&N Dec. 439, 445 (BIA 1987); *see also Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir. 1985) (noting that establishment of objective facts through testimony alone does not make them any less objective), *aff'd*, 480 U.S. 421 (1987).

The majority correctly states that credible testimony alone is "not necessarily dispositive." *Matter of E-P-, supra*, at 862. But what is the additional evidence that is required in order for the applicant to meet her burden of proof? It is not for the applicant to prove each and every one of the majority's expectations of evidence that *might* provide even further support of her claim. Yet in endorsing the analysis of the Immigration Judge, the majority states, without hesitating, that the applicant's claim fails because "[s]he has not set forth a basis to establish why the persons previously observing the church had a specific knowledge of her name at that time, or in the years that have passed." *Id*. at 862.

What is required, is for the applicant to establish that her credible testimony of the events in question and her fears have what we call a "nexus" with, or are related to, one of the five grounds articulated in the statutory definition of refugee. Does she need to show that the persecutor knew her name? Of course not. Would such evidence help support her claim? Probably. But does its absence overcome credible evidence that she was a churchgoer in a church known for its active support of Aristide; that she, along with others who also were shot at, had been watched; that her uncle with whom she lived was affiliated with the F.N.C.D. and the pro-Aristide meetings were held in her house; and that this uncle and two cousins were killed by the military? No, it does not.

In fact, a fair recitation of the facts reveals that the applicant did provide detail concerning the names of her relatives, the nature of her beliefs, and the particulars of the incidents involving the murders of her family members and the attack on the church members, including the chronology of events, the dates and time of day of these events, where she was located during each event, who else was present, what damage was done, and how she responded. That a claim of feared persecution is simple and straightforward does not provide a basis to conclude that it is lacking in detail or that it fails to meet an applicant's burden of proof. To say that the applicant is credible, but then to conclude that her testimony was vague or lacking in detail without stating valid reasons supporting that finding, is itself unacceptably vague.

## II. DETERMINATION OF WELL-FOUNDED FEAR OF PERSECUTION

### A. Politically Motivated Harm to Family Members as a Basis for Asylum

Both we and the courts have recognized that the mistreatment of family members has a bearing on the persecution suffered by the asylum applicant. It not only may constitute persecution for the asylum applicant to witness or experience the persecution of family members,[5] but it serves to corroborate his or her own fear of persecution. *See Rodriguez-Matamoros v. INS*, 88 F.3d 158 (9th Cir. 1996) (finding credible testimony of applicant being beaten, her family threatened with being burned alive, and witnessing her sister being tortured and killed in her presence on account of her family's political beliefs); *Gebremichael v. INS*, 10 F.3d 28 (1st Cir. 1993) (finding family membership to be a fundamental affiliation, and link between family membership and persecution to be manifest, citing *Ravindran v. INS*, 976 F.2d 754, 761, n.5 (1st Cir. 1992)); *see also Matter of Villalta*, 20 I&N Dec. 142 (BIA 1990) (holding that threats of harm to immediate family in part on account of applicant's political activities, and the actual murder of his brother, supported well-founded fear of persecution).

We are not exempt from the rule that the precedent decisions of the Board are controlling on the Executive Office for Immigration Review and the Immigration and Naturalization Service. 8 C.F.R. § 3.1(g) (1996). I see no reason to analyze the facts in this case any differently than we did in *Matter of Villalta, supra*. There, the asylum seeker, who was active in a student political organization, had not been harmed himself, but other members of his

---

[5] In addition, in assessing the severity of past persecution, the courts have required the Board to consider the treatment of family members. *Kahssai v. INS*, 16 F.3d 323, 329 (9th Cir. 1994) (stating that relevant factors include experiences which adversely affect personal, religious or gender-based identity and not entirely physical harm); *Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988).

family associated with organizations that opposed the Government of El Salvador had been killed.

The majority concedes that the applicant's family members were killed and that their murders were most probably due to their pro-Aristide activities. The fact of actual harm being carried out by a persecutor is a threat. The applicant has shown that the military were aware of her views, could be aware of her family ties, and pursued her after her relatives' deaths. *Matter of Mogharrabi, supra*. Yet the majority erroneously fails to accord these facts any significance with regard to the applicant's situation.

To the contrary, not only does our precedent so hold, but treatment of an asylum applicant's family members is considered by the courts to be a significant factor in determining the reasonableness of the applicant's fear of persecution and her belief that the persecution would be in part on account of her social group and political views. *See, e.g., Hernandez-Ortiz v. INS*, 777 F.2d 509, 515 (9th Cir. 1985) (noting the relevance of a number of threats or acts of violence directed at family members in concluding that the alien's life or freedom is endangered). In fact, "one incident of an arrest of a family member at a church may provide the basis for past persecution of [a] petitioner's family on account of religion." Jin Ying Li v. INS, 92 F.3d 985, 987 (9th Cir. 1996); *see also Ramirez Rivas v. INS*, 899 F.2d 864, 865-67 (9th Cir. 1990).

The treatment of the applicant's family bolsters the view that her fear is well founded. *See Ananeh-Firempong v. INS*, 766 F.2d 621 (1st Cir. 1985) (concluding that evidence of treatment of one's family is probative of a threat to the petitioner); *Handbook, supra*, para. 43, at 13 (stating that an applicant need not show a threat of persecution based on personal experience, as evidence concerning relatives may support the conclusion that fear is well founded); *Ramos-Vasquez v. INS*, 57 F.3d 857 (9th Cir. 1995) (citing *Ariaga-Barrientos v. INS*, 937 F.2d 411, 414 (9th Cir. 1991)) (finding that notwithstanding an utter lack of persecution against the petitioner himself, violence against friends and family which creates a pattern of persecution closely tied to the petitioner may establish a well-founded fear); *see also Coriolan v. INS,* 559 F.2d 993 (5th Cir. 1977). Finally, in the absence of any showing that the applicant's sister and child, neither of whom appear to be adults, were known to hold anti-military views or were associated with her uncle as she was, the fact that the applicant's surviving family still lives in Haiti without further harm is hardly determinative of the risk of persecution to her.

## B. Harm on Account of Political Opinion or Imputed Opinion

The facts that the applicant was not harmed because she was aware of the impending attack on the church and escaped early, and that she survived the attack on her uncle and cousins at their home, are not determinative of her claim to have a well-founded fear of persecution should she be forced to return. *See Cordero-Trejo v. INS*, 40 F.3d 482, 489 (1st Cir. 1994) (stating

that to infer that an asylum applicant is unlikely to be persecuted because he and his relatives were not killed during attempts to terrorize them "'lead[s] to the absurd result of denying asylum to those who have actually experienced persecution and were fortunate enough to survive'") (quoting *Del Valle v. INS,* 776 F.2d 1407, 1413 (9th Cir. 1985)); *see also Sotelo-Aguije v. Slattery*, 17 F.3d 33 (2d Cir. 1994) (holding that evidence of threats alone are sufficient to establish a well-founded fear, and the absence of physical harm or a face-to-face confrontation is not determinative).

The proper inquiry is whether the applicant has proven that she has a belief or characteristic offensive to the persecutor, of which the persecutor could be aware, and that the alleged persecutor has the inclination and ability to punish or harm her, at least in part, on account of that belief or characteristic. *Matter of S-P-, supra; Matter of Mogharrabi, supra*. She also must establish that a reasonable person would believe her attackers were politically motivated. *INS v. Elias-Zacarias, supra*. The persecutor's erroneous belief that the victim held an opposing political view, when in fact his opposition was based on religion or imputed because of family ties, does not undermine the persecutor's having been motivated on a protected ground. *Lopez-Galarza v. INS*, 99 F.3d 954 (9th Cir. 1996); *Canas-Segovia v. INS*, 970 F.2d 599, 601 (9th Cir. 1992). I find that she has established each of these elements.

Moreover, the courts have recognized that in considering claims of persecution it is "'highly advisable to avoid assumptions regarding the way other societies operate.'" *Perez-Alvarez v. INS*, 857 F.2d 23, 24 (1st Cir. 1988) (quoting Board Member Heilman's dissent in a decision addressing the possibility of persecution resulting from union activity engaged in some 10 years earlier). Specifically, we have been cautioned time and again that conjecture about what persecutors likely would and would not do is not a substitute for substantial evidence. *See Cordero-Trejo v. INS, supra*, at 440 (finding that each "'inconsistency' or 'implausibility'" noted by the Immigration Judge either appears to be without support in the record, inexplicably refutes uncontroverted testimony or is flatly contradicted by background and country conditions evidence).

More particularly, our rejection of claims by those who have escaped harm as being implausible is routinely questioned by the courts. *See, e.g., Mosa v. Rogers,* 89 F.3d 601 (9th Cir. 1996) (finding no basis for the Immigration Judge's conclusion that the applicant would have been executed instead of only detained if there actually were spies at his school); *see also Lopez-Reyes v. INS,* 79 F.3d 908 (9th Cir. 1996) (finding that a Guatemalan who was released by his torturers was not incredible because he was not killed); *Turcios v. INS*, 821 F.2d 1396, 1399 (9th Cir. 1987) (holding that a finding it was "astonishing" that after being chased, shot at, and beaten by guerrillas, an applicant was released rather than killed, does not set forth a specific cogent reason to disbelieve the applicant). This tendency to diminish the weight given to incidents of confrontation with the persecutor which may

not alone rise to the level of persecution has also been criticized in contexts other than credibility determinations. *See Abdel-Masieh v. INS*, 73 F.3d 579 (5th Cir. 1996) (finding it unreasonable for the Board to conclude that past actions which might not amount to persecution do not create an "outer limit" on the persecutors' future actions).

Apart from the fact that these cases exemplify that an asylum applicant should not be treated as though she lacks credibility and her claim is not plausible since she escaped or was spared persecution, these situations raise the issue of permissible inferences under the *INS v. Cardoza-Fonseca, Matter of Mogharrabi*, and *Matter of S-P-* standards. As I discussed in my dissenting opinion in *Matter of T-M-B-, supra*, when the applicant's burden is less than a preponderance of the evidence in support of her claim, there is always the possibility that more than one reasonable inference can be drawn from the facts. Preference of one to the other is not appropriate when one scenario satisfies the well-founded fear standard. In addition, where an applicant is unable to provide support for all of his or her statements, yet provides a credible and coherent account, he or she should be given the benefit of the doubt. *Handbook, supra*, para. 196, at 47. This is such a case.

## C. Content and Use of Country Conditions Information

The majority also bases its denial of the applicant's asylum claim on the September 1995 Department of State *Profile* which purports to address relevant country conditions in Haiti having a bearing on the plausibility of the applicant's claim. *Matter of S-M-J-, supra*. The *Profile* indicates that with regard to the temporary nature of the restoration of democracy, it cannot predict the long term future in Haiti. *Profile, supra*, at Part Two, V., G. The *Profile* reports that although a weapons round up began in October 1994, numbers of former attaches, or paramilitary personnel aligned with the former military, are thought to have "gone to ground" with their weapons. *Id.* Part Two, II, B. In 1994, "credible reports" of relatives of rank and file Aristidists being raped, murdered, and kidnaped were encountered. *Id.* Part Three, I., 2.

The majority, moreover, admits that additional country conditions evidence was submitted by the applicant to demonstrate that her fear continues to be well founded. *Matter of E-P-, supra*, at 863. In this material, in a press release dated November 1995, President Aristide stated that attacks by former Haitian soldiers continue because "disarmament has not been done as it should." In the Miami Herald of Friday, December 15, 1995, an article discussing the possibility that hidden arsenals are maintained, frustrating the disarmament policy, quotes a Miami-based lawyer representing the Haitian Government who states that the military had very specific information concerning to whom it distributed weapons, yet there are "tens of thousands" of weapons that were never recovered.

In addition, in 7 Human Rights Watch/Americas, National Coalition for Haitian Refugees, *Haiti: Human Rights After Aristide's Return*, No. 11 (Oct. 1995), the organization Human Rights Watch/Americas reports that as of early October 1995, no member of the former military had been successfully prosecuted, and one third of the former military is still in uniform as police officers. Other former soldiers are becoming "increasingly dissatisfied" with the retraining programs conducted by the International Organization of Migration ("IOM"), and are said to have formed two parties (at least one of which has been associated with a right-wing political party), heightening concern that these disgruntled soldiers, although demobilized, represent a potentially destabilizing force. *Id*. at 17.

Nonetheless, without explanation, while the applicant's evidence of country conditions and the evaluation contained in the Department of State *Profile* both indicate that (1) the former military forces still may have weapons and may continue to pose a danger as many with weapons have "gone to ground," and (2) there have been efforts to assimilate other former members of the military into the police and military under Aristide and Preval, the majority apparently rejects this evidence. They simply conclude that the applicant did not provide "adequate evidence" to support a finding that she has a well-founded fear of persecution. *Cf. Matter of S-M-J-, supra*. This conclusion is unreasoned and arbitrary. *Coriolan v. INS, supra*, at 1002-03 (reasoning that immigration authorities could not properly decide an alien's fate without taking note of conditions in the alien's country and recognizing the materiality of an Amnesty International Report as being beyond dispute).

Ultimately determinative is whether, given the objective conditions in 1991 (i.e., the military watching church members come and go, and shooting churchgoers as they left the church which the applicant and her uncle attended, coupled with the military's murder of her other uncle and cousins as they burst in the door of their house), and the conditions in Haiti now, the applicant's fear of persecution is reasonable. *Matter of Mogharrabi, supra*. The quantum of evidence which substantiates a well-founded fear of persecution, and, in particular, affects the determination of its reasonableness, has been addressed by the Supreme Court as a 10 percent chance of facing persecution in the future. *See INS v. Cardoza-Fonseca, supra*, at 440 (recognizing that there "is simply no room in the United Nations' definition [of refugee, essentially the same as the Immigration and Naturalization Act definition] for concluding that because an applicant only has a 10% chance of being . . . persecuted, that he or she has no 'well-founded fear' of the event happening"). The conditions in Haiti have not so totally changed that the applicant no longer can be said to have a reasonable fear of persecution.

### III. CONCLUSION

Our precedent and other legal authority mandate a result other than that reached by the majority. Applicable law supports neither the majority's conclusion that the applicant's past experiences do not constitute a basis to find that she has a well-founded fear of persecution on account of an actual or imputed political opinion, nor their conclusion that the change in conditions in Haiti since the time of those experiences extinguishes her well-founded fear of persecution. While there is some authority that would support a conclusion that the applicant has suffered past persecution, I find it unnecessary to make that determination, as both the *Profile* and the documentary evidence submitted by the applicant support her continuing fear of persecution being well founded even after the return of Aristide and the election of current President Rene Preval. *INS v. Cardoza-Fonseca, supra.*

Under these circumstances, I believe that the applicant has met her burden of proof and that asylum should be granted.